## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| **REGINALD VERNARD CAMPBELL,** | § | |
| #02247551 | § | |
| | § | **CIVIL ACTION NO.  4:20cv675** |
| **VS.** | § | |
| | § | |
| **DIRECTOR, TDCJ-CID** | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

*Pro Se* Petitioner Reginald Vernard Campbell, an inmate confined in the Texas prison system, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition was referred to United States Magistrate Judge Kimberly C. Priest Johnson for findings of fact, conclusions of law, and recommendations for the disposition of the case pursuant to 28 U.S.C. § 636, and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to the United States Magistrate Judge.

## I.  PROCEDURAL BACKGROUND

Petitioner is challenging his Grayson County conviction, Cause No. 068883. Petitioner was charged in a three-count indictment with capital murder in the course of a felony (Count 1), murder (Count 2), and aggravated robbery (Count 3). (Dkt. #16-2, pp. 12-13). On February 8, 2019, pursuant to a plea agreement, Petitioner pled guilty to capital murder (Count 1), waived his right to file an appeal, and was sentenced to confinement for life without the possibility of parole. (Dkt. #16-2, pp. 107-09). The State dismissed the remaining counts. (Dkt. #16-2, p. 107). Petitioner did not appeal his conviction or sentence.

Petitioner subsequently filed a state application for writ of habeas corpus. (Dkt. #16-2, pp. 110-28). On June 9, 2020, the state habeas court entered finding of facts and conclusions of law

and recommended that Petitioner's application be denied. (Dkt. #16-2, pp. 332-42). On July 29, 2020, the Texas Court of Criminal Appeals ("TCCA") denied the application without a written order on the findings of the state habeas court after a hearing and on the court's independent review of the record. (Dkt. #16-1).

Petitioner filed the instant petition on August 31, 2020.[1] (Dkt. #3). Petitioner asserts the following claims for relief:

1.     Seizure of the murder weapon was unlawfully obtained in violation of the Fourth Amendment.

2.     The trial court denied Petitioner due process when it knowingly accepted Petitioner's guilty plea despite Petitioner's history of mental illness.

3.     The trial court abused its discretion when it refused to remove Petitioner's defense team.

4.     He was denied effective assistance of counsel when counsel failed to:

     a.   file a motion to suppress evidence;

     b.   file a motion to change venue; and

     c.   request the trial court for funding to hire a psychiatrist due to Petitioner's history of mental illness.

(Dkt. #3, pp. 6-8).[2] The Director filed a response, arguing that the petition should be dismissed with prejudice because Petitioner's claims are time-barred. (Dkt. #15, pp. 5-7). Alternatively, the Director argues that Petitioner's claims are either unexhausted and procedurally barred or without merit. (Dkt. #15, pp. 7-23). Petitioner filed several replies.[3] (Dkt. ##23, 24, 28).

---

[1] A *pro se* prisoner's habeas corpus petition is deemed filed, for the purposes of the Antiterrorism and Effective Death Penalty Act of 1996, when the prisoner delivers the papers to prison authorities for mailing. *Cousin v. Lensing*, 310 F.3d 843, 847 (5th Cir. 2002); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998). Petitioner declared under penalty of perjury that he deposited the petition in the prison mailing system on August 31, 2020. (Dkt. #3, p. 10).

[2] The Court has reordered the claims from the manner presented in the petition for ease of resolution.

[3] Any new claim raised for the first time in Petitioner's reply briefs are not considered by the Court. *See Taylor v. Davis*, No. 4:17-CV-220-O, 2018 WL 5026280, at *1 n.4 (N.D. Tex. Oct. 17, 2018) (citing *United States v. Sangs*, 31

## II. ANTITERRORISM AND EFFECTIVE DEATH PENALTY ACT OF 1996

On April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") was signed into law. The law made several changes to the federal habeas corpus statutes, including the addition of a one-year statute of limitations. 28 U.S.C. § 2244(d)(1). The AEDPA provides that the one-year limitations period shall run from the latest of four possible situations. Section 2244(d)(1)(A) specifies that the limitations period shall run from the date a judgment becomes final by the conclusion of direct review or the expiration of the time for seeking such review. Section 2244(d)(1)(B) specifies that the limitations period shall run from the date an impediment to filing created by the State is removed. Section 2244(d)(1)(C) specifies that the limitations period shall run from the date in which a constitutional right has been initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review. Section 2244(d)(1)(D) states that the limitations period shall run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."

In the present case, the appropriate section to employ is Section 2244(d)(1)(A). Petitioner was sentenced on February 8, 2019. Petitioner did not file a notice of appeal; thus, his conviction became final on March 11, 2019,[4] at the conclusion of the thirty days in which he could have filed a timely direct appeal.[5] *See* Tex. R. App. P. 26.2; *Egerton v. Cockrell*, 334 F.3d 433, 435 (5th Cir.

---

Fed. App'x 152, 2001 WL 1747884, at *1 (5th Cir. Dec. 11, 2001) (affirming, in § 2255 context, district court's refusal to consider issue raised for the first time in reply to government's answer to habeas petition) (citing *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998))).

[4] Petitioner was sentenced on February 8, 2019. Thirty days later—March 10, 2019—was a Sunday, so the last day Petitioner could have filed an appeal was Monday, March 11, 2019. *See* Tex. R. App. P. 4.1.

[5] The federal district courts in Texas have commenced the limitations period thirty days after the conviction was rendered even when a petitioner waives his right to appeal and then fails to file an appeal. *See, e.g.*, *Jackson v. Dir.*, No. CIV.A 6:09CV338, 2010 WL 2209622, at *2 (E.D. Tex. May 11, 2010), *report and recommendation adopted*, No. CIV.A 6:09CV338, 2010 WL 2209620 (E.D. Tex. May 28, 2010); *Moreno v. Director, TDCJ*, No. 6:07CV556, 2008 WL 2225676 (E.D. Tex., May 28, 2008) (collecting cases from the Eastern, Southern, and Northern Districts of Texas).

2003); *Scott v. Johnson*, 227 F.3d 260, 262 (5th Cir. 2000). Therefore, Petitioner had until March 11, 2020, to file his federal habeas petition, absent any tolling of the statute of limitations.

The provisions of 28 U.S.C. § 2244(d)(2) provide that "[t]he time during which a properly filed application for State post-conviction or other collateral review is pending with respect to the pertinent judgment or claim shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2). The Supreme Court held that "an application is '*properly filed*' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings." *Artuz v. Bennett*, 531 U.S. 4, 8 (2000) (emphasis in original); *see also Larry v. Dretke*, 361 F.3d 890, 895 (5th Cir. 2004).

Petitioner filed his state application for writ of habeas corpus on February 12, 2020.[6] The TCCA denied the application on July 29, 2020. The limitations period was tolled for 168 days while that application was pending, so the § 2254 petition was due on August 26, 2020. Petitioner's § 2254 petition was signed and deposited in the prison mail system on August 31, 2020. It is therefore untimely.[7] Although the Petition is time-barred, the Court will address Petitioner's claims in an abundance of caution.

---

[6] Under the prison mailbox rule, "pleadings of *pro se* inmates, including petitions for state post-conviction relief, are deemed filed at the time they are delivered to prison authorities, not at the time they are stamped by the clerk of the court." *Richards v. Thaler*, 710 F.3d 573, 578-79 (5th Cir. 2013). As noted by the Director, the state habeas application form does not require the petitioner to provide a date on which he submitted his application to the prison mail system (Dkt. #15, pp. 3-4, n.4), and indeed, Petitioner did not state when he delivered his state habeas application to prison authorities. But because Petitioner signed and dated his state application on February 12, 2020 (Dkt. #16-2, p. 125), it could not have been filed before that date. *See Ford v. Davis*, 910 F.3d 232, 236 n.7 (5th Cir. 2018). The Director also utilizes February 12, 2020, as the date the state application was filed.

[7] Liberally construing Petitioner's argument, he contends that he is entitled to equitable tolling because: (1) annual lockdowns or lockdowns during the COVID-19 pandemic; (2) he was placed in administrative segregation and consequently without his legal materials; and (3) he was transferred to four different units and there were delays in shipping his legal work to each new unit. (Dkt. #24, p. 11). None of these reasons constitutes "extraordinary circumstances" that would entitle Petitioner to equitable tolling of the limitations period. *See, e.g.*, *Boswell v. Claiborne Par. Det. Ctr.*, 14-31250, 2015 WL 6161810 (5th Cir. Oct. 21, 2015) ("Boswell's contentions that he is entitled to equitable tolling of the limitations period because he 'had no knowledge of the civil law,' was given incorrect legal advice by a 'prison inmate counsel,' and lacked access to the prison law library while in administrative segregation are unavailing."); *Felder v. Johnson*, 204 F.3d 168, 171-72 (5th Cir. 2000) (holding that ignorance of the law, temporary denial of access to legal materials, lack of knowledge of filing deadlines, and inadequacies of a prison

### III.  STANDARD FOR FEDERAL HABEAS CORPUS RELIEF

The role of federal courts in reviewing habeas corpus petitions by prisoners in state custody is exceedingly narrow. A person seeking federal habeas corpus review must assert a violation of a federal constitutional right. *Lowery v. Collins*, 988 F.2d 1354, 1367 (5th Cir. 1993); *Malchi v. Thaler*, 211 F.3d 953, 957 (5th Cir. 2000). Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996); *Brown v. Dretke*, 419 F.3d 365, 376 (5th Cir. 2005). In the course of reviewing state proceedings, a federal court does not sit as a super state appellate court. *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).

The prospect of federal courts granting habeas corpus relief to state prisoners has been further limited by the AEDPA. The new provisions of § 2254(d) provide that an application for a

---

law library are insufficient to warrant equitable tolling); *Young v. Mississippi*, No. 3:20-CV-736-TSL-RPM, 2021 WL 4190646, at * 5 (S.D. Miss Aug. 6, 2021) ("[T]he mere existence of the COVID-19 pandemic does not, without more, constitute an 'extraordinary circumstance' warranting the application of equitable tolling."), *report and recommendation adopted sub nom. Young v. Mississippi,* No. 3:20CV736TSL-RPM, 2021 WL 4189634 (S.D. Miss. Sept. 14, 2021); *Delarosa v. Dir., TDCJ-CID*, No. 3:21-CV-2414-D-BK, 2022 WL 850041, at **2-3 (N.D. Tex. Feb. 22, 2022) (intermittent lockdowns and diminished access to the law library, even as a result of COVID-19 restrictions, do not constitute "extraordinary circumstances" warranting equitable tolling), *report and recommendation adopted sub nom. Delarosa v. Dir., TDCJ-CID*, No. 3:21-CV-2414-D, 2022 WL 847216 (N.D. Tex. Mar. 22, 2022); *Bradden v. Lumpkin*, No. 4:21-CV-126-O, 2021 WL 4866992, at *3 (N.D. Tex. Sept. 17, 2021) (finding access to some law library material—albeit on a limited and sometimes delayed basis due to the COVID-19 pandemic—and sporadic lockdowns were not grounds for equitable tolling); *Cruz v. Lumpkin*, No. 4:21-CV-610-P, 2021 WL 3710568, at **2-3 (N.D. Tex. Aug. 18, 2021) (concluding intermittent lockdowns, limited access to the prison law library, and an inability to obtain legal assistance because of COVID-19 pandemic procedures did not prevent the filing of the federal habeas petition and, thus, were not grounds for equitable tolling); *Soliz v. Dir., TDCJ-CID*, No. 6:21CV016, 2021 WL 3674105, at *3 (E.D. Tex. July 9, 2021) ("Petitioner refers vaguely to a "hampered . . . ability to conduct legal research," but he does not allege any facts that establish that the alleged pandemic precautions actually prevented him from filing a timely habeas petition."), *report and recommendation adopted*, No. 6:21-CV-16-JDK-JDL, 2021 WL 3666058 (E.D. Tex. Aug. 18, 2021); *White v. Dir.*, TDCJ-CID, No. 6:19CV231, 2021 WL 1015951, at *4 (E.D. Tex. Feb. 5, 2021) (finding COVID-19 lockdowns and diminished library access did not prevent filing and, thus, did not justify equitable tolling), *report and recommendation adopted*, 2021 WL 978760, at *1 (E.D. Tex. Mar. 16, 2021); *United States v. Pizarro*, No. CR 16-63, 2021 WL 76405, at *2 (E.D. La. Jan. 8, 2021) (finding that a COVID-19 lockdown did not justify equitable tolling as it did not actually prevent the petitioner filing his habeas petition); *Coppin v. United States*, No. 3:10-CR0345-K91, 2018 WL 1122175, at *4 (N.D. Tex. Mar. 1, 2018) (finding series of institutional lockdowns did not constitute an extraordinary circumstance warranting equitable tolling).

writ of habeas corpus shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) was contrary to federal law then clearly established in the holdings of the Supreme Court; (2) involved an unreasonable application of clearly established Supreme Court precedent; or (3) was based on an unreasonable determination of the facts in light of the record before the state court. *See Harrington v. Richter*, 562 U.S. 86, 97-98 (2011).

The statutory provision requires federal courts to be deferential to habeas corpus decisions on the merits by state courts. *Renico v. Lett*, 559 U.S. 766, 773 (2010); *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002). Furthermore, a state court's factual findings are entitled to deference and are presumed correct unless the petitioner rebuts those findings with clear and convincing evidence. *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir. 2010); *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006); *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001); *see also Moore*, 313 F.3d at 881 (the statutory provision requires federal courts to be deferential to habeas corpus decisions on the merits by state courts). This deference extends not only to express findings of fact, but also to any implicit findings of the state court. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005)). Where, as here, "the state habeas court and trial court are one in the same," the presumption of correctness afforded the state habeas court's factual determinations is "especially strong." *Mays v. Stephens*, 757 F.3d 211, 214 (5th Cir. 2014) (citations omitted).

A decision by a state court is "contrary to" the Supreme Court's clearly established law if it "applies a rule that contradicts the law set forth in" the Supreme Court's cases. *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). A federal court's review of a decision based on the "unreasonable application" test should only review the

"state court's 'decision' and not the written opinion explaining that decision." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas corpus court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, that application must be objectively unreasonable. *Id.* at 409. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the decision. *Richter*, 562 U.S. at 87 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *see Johnson v. Williams*, 568 U.S. 289, 293 (2013) (holding there is a rebuttable presumption that the federal claim was adjudicated on the merits when the state court addresses some claims, but not others, in its opinion).

"In Texas writ jurisprudence, usually a denial of relief rather than a 'dismissal' of the claim by the Court of Criminal Appeals disposes of the merits of a claim." *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *see also Henderson v. Cockrell,* 333 F.3d 592, 598 (5th Cir. 2003); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (holding a "denial" signifies an adjudication on the merits while a "dismissal" means the claim was declined on grounds other than the merits). Thus, a state application that is denied without written order by the TCCA, as in the present case, is an adjudication on the merits. *See Singleton*, 178 F.3d at 384; *Ex parte Torres*, 943 S.W.2d at 472.

In addition to the standard of review imposed by the AEDPA, the petitioner must also show that any constitutional error had a "substantial and injurious effect or influence" on the verdict to

be entitled to habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The Supreme Court explained that, while the passage of the AEDPA "announced certain new conditions to [habeas] relief," it did not supersede or replace the harmless error standard announced in *Brecht*. *Brown v. Davenport*, ___ U.S. ___, 142 S. Ct. 1510, 1524 (2022). In other words, a habeas petitioner must also satisfy *Brecht*, even if the AEDPA applies. *See id.* ("[A] federal court must deny relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests.") (emphasis in original). Additionally, federal habeas relief is foreclosed if a claim: (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); or (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989).

Thus, the federal writ serves as a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.

## IV.  ANALYSIS

### A.    Guilty Plea

Petitioner pled guilty to capital murder pursuant to a plea agreement. A federal court will uphold a guilty plea challenged in a habeas corpus proceeding if the plea was knowing, voluntary, and intelligent. *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000); *Hobbs v. Blackburn*, 752 F.2d 1079, 1081 (5th Cir. 1985), *cert. denied*, 474 U.S. 838 (1985). To be knowing and intelligent, the defendant must have "a full understanding of what the plea connotes and of its consequence." *United States v. Hernandez*, 234 F.3d 252, 255 (5th Cir. 2000) (citing *Boykin v. Alabama*, 395 U.S.

238, 244 (1969)). "The defendant need only understand the direct consequences of the plea; he need not be made aware [of] every consequence that, absent a plea of guilty, would not otherwise occur." *Id.* (citations omitted). With respect to voluntariness, the question becomes whether the plea was induced by threats or improper promises. *Montoya*, 226 F.3d at 405; *see also United States v. Nunez*, 539 F. App'x 502, 503 (5th Cir. 2013) ("Whether a plea is knowing looks to whether the defendant understands the direct consequences of his plea, while voluntariness looks to, inter alia, whether the plea was induced by threats or improper promises."). The Supreme Court has explained:

> A plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Brady v. United States*, 397 U.S. 742, 755 (1970).

Moreover, "[s]olemn declarations in open court carry a strong presumption of verity," forming a "formidable barrier in any subsequent collateral proceedings." *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998) (quoting *Blackledge v. Allison*, 432 U.S. 63, 73-74 (1977)); *see also United States v. Perez*, 690 F. App'x 191, 192 (5th Cir. 2017) ("A defendant's solemn declarations in open court carry a strong presumption of truth.") (quoting *Blackledge*, 431 U.S. at 74); *United States v. Cothran*, 302 F.3d 279, 283-84 (5th Cir. 2002) ("Reviewing courts give great weight to the defendant's statements at the plea colloquy."). As a result, a petitioner faces the heavy burden of proving that he is entitled to relief through overcoming the evidence of his own words. *DeVille v. Whitley*, 21 F.3d 654, 659 (5th Cir. 1994) ("Although their attestations to voluntariness are not an absolute bar to raising this claim, Appellants face a heavy burden in proving that they are entitled to relief because such testimony in open court carries a strong

presumption of verity."); *see also United States v. Raetzsch*, 781 F.2d 1149, 1151 (5th Cir. 1986) (holding that there must be independent indicia of the likely merit of the petitioner's contentions; mere contradiction of the statements made at the guilty plea proceeding will not suffice); *cf. United States v. Fuller*, 769 F.2d 1095, 1099 (5th Cir. 1985) (to be entitled to an evidentiary hearing on a claim that sworn statements made during the guilty plea proceeding were false, the petitioner must make "specific factual allegations supported by the affidavit of a reliable third witness").

In the state habeas proceedings, the state habeas court made the following findings with respect to Petitioner's guilty plea:

7. The applicant plead guilty to Count 1 of the indictment on February 8, 2019.

8. The applicant signed paperwork admitting his guilt and agreeing to the State's plea offer.

9. The Judge's Admonishment in this case which was acknowledged and signed by the applicant.

. . . .

21. At no time did either attorney or any person associated with the case, coerce or attempt to coerce the applicant into entering a plea in this case.

22. The applicant discussed the State's plea offer and the evidence that would be presented at both the Guilt-Innocence and Sentencing phases with counsel and members of the defense team on multiple occasions.

23. The decision to plead guilty was made by the applicant knowingly and intelligently after the law and the facts of the case were explained to him in detail.

24. When asked by the trial court if he was pleading guilty because he was guilty and for no other reason, the applicant told the trial court, "[y]es."

. . . .

26. [T]he applicant spent many hours with his defense team.

27.     At no time during the meetings with counsel and mitigation specialists did the appellant exhibit a lack of rational or factual understanding of the proceedings against him.

28.     The applicant was competent and able to understand the consequences of his decisions as they related to a plea in this case.

29.     The trial court's questioning of the applicant also concluded that despite any mental issues as a juvenile, the applicant was competent and understood the nature of the proceedings against him and the consequences of a guilty plea.

        . . . .

31.     All parties were aware that there was additional DNA testing pending at the time of the guilty plea.

32.     The applicant was fully aware that all potential DNA testing was not complete and chose to go forward with the plea anyway.

33.     The incomplete DNA testing was discussed at length during the guilty plea hearing and the applicant clearly knew of the incomplete testing and wished to plead guilty at that time even [without] all of the testing.

        . . . .

35.     The applicant indicated to his defense team that he wished to plead guilty.

36.     The paperwork was read aloud to him and each item in the plea paperwork was explained to the applicant.

37.     When asked if he understood the paperwork, he told his defense team that he [had] no further questions or concerns.

38.     Defense counsel explained in detail all of the applicant's rights, the waivers of rights, and the Constitutional rights which the applicant would be giving up by pleading guilty.

39.     The applicant told the trial court that he understood all of the paperwork signed, wanted to waive his rights, and wanted to plead guilty.

(Dkt. #16-2, pp. 333-37). Thus, the state habeas court found that Petitioner knowingly and

voluntarily pled guilty. Where, as here, the state habeas court and trial court are one in the same,

the presumption of correctness afforded the state habeas court's factual determinations is

11

"especially strong." *Mays*, 757 F.3d at 214. The TCCA then adopted the state habeas court's findings when it denied relief without written order.

Petitioner fails to rebut the presumptive correctness of the state court's findings with clear and convincing evidence, nor does an independent review of the state court record reveal clear and convincing evidence that would rebut the presumption of correctness. The record shows that Petitioner appeared in court with counsel and entered a plea of guilty to Count 1 of the indictment—capital murder. (Dkt. #16-2, pp. 107-08). Petitioner signed plea documents, including "Judge's Admonishment," "Defendant's Acknowledgment and Waiver of Rights," and "Defendant's Agreement to Stipulate Evidence and Defendant's Stipulation," which informed him of the charge against him and the range of punishment. (#16-2, pp. 16-30). These documents also informed Petitioner that the plea bargain agreement recommended a sentence to life without parole on Count One—capital murder—and the withdrawal and dismissal of Count Two and Count Three. (Dkt. #16-2, pp. 16-19). In these documents, Petitioner affirmed that he reviewed the judge's admonishments with his counsel and understood them; that he was mentally competent and understood the capital murder charge in the indictment; that he was fully aware of the range of punishment for the offense and the consequences of his plea; that he entered his plea voluntarily and knowingly; that his plea was "not influenced by any considerations of fear or any persuasion or any delusive hope of pardon"; that in making his guilty plea he did not rely on "any advice, information or agreement not made apparent to the Court"; and that he was "totally satisfied" with his counsel's representation and "was provided fully effective and competent representation." Petitioner also signed a document waiving his constitutional rights and agreeing to stipulate to the evidence and to judicially confess his guilt. (Dkt. #16-2, pp. 25-26). Specifically, Petitioner stipulated that the allegations included in the indictment were "true and correct" and that if the

State were to call witnesses, the evidence would prove beyond a reasonable doubt that he was guilty of the offense exactly as charged in the indictment. (Dkt. #16-2, p. 25). These documents were all reviewed and signed by Petitioner's counsel, the prosecutor, and the trial court.

Additionally, the transcript of the plea hearing reflects that the trial court admonished Petitioner as required by law. (*See generally* Dkt. #16-2, pp. 256-328). At the plea hearing, Petitioner confirmed that he understood the capital murder charge in the indictment and the range of punishment if convicted at trial; that he wished to waive certain constitutional rights in exchange for entering a guilty plea; that he understood that by pleading guilty he would eliminate the possibility of the death penalty and would be sentenced to life in prison without the possibility of parole; that he had no mental health issues;[8] that he understood the consequences of his guilty plea; that he was satisfied with his counsel's representation; that he was pleading guilty because he was in fact guilty and for no other reason; that nobody promised him parole or a pardon if he pled guilty; that he reviewed the plea documents with his counsel before signing them; that he signed the plea documents freely and voluntarily; that he understood that by signing the plea documents he waived certain constitutional rights and admitted certain facts; and that he understood the appeal waiver. (Dkt. #16-2, pp. 256-328). The trial court accepted Petitioner's guilty plea, finding that Petitioner was mentally competent, that his plea was freely and voluntarily entered, and that the evidence was sufficient to establish Petitioner's guilt beyond a reasonable doubt as to the capital murder charge. (Dkt. #16-2, pp. 108, 265, 325-26).

These official court records "are entitled to a presumption of regularity and are accorded great evidentiary weight" on habeas corpus review. *Hobbs*, 752 F.2d at 1081-82 (citations

---

[8] Petitioner's counsel explained to the trial court that, as a young man, Petitioner "did have some evaluations done," but as an adult, "he has not had any questions as to his competency, and is competent to enter his plea today." (Dkt. #16-2, p. 263).

omitted). By signing each of the documents and pleading guilty in open court, Petitioner made declarations entitled to significant weight. The record shows that Petitioner understood the nature of the charges against him, as well as the consequences of pleading guilty to Count 1 of the indictment. Thus, as the state court found, Petitioner knowingly and voluntarily pled guilty.

## B.    Claim One

In Claim One, Petitioner argues that seizure of the murder weapon was unlawfully obtained in violation of the Fourth Amendment. (Dkt. #3, p. 6).

When Petitioner raised this Fourth Amendment issue in his state habeas application, the state habeas court found as follows:

> 10.    The applicant specifically was advised, and the applicant acknowledged, that if he plead guilty and the judge accepted the plea agreement, the applicant would not be able to appeal any matter not raised prior to trial and ruled on by the Court prior to trial.

> 11.    The applicant waived his right to appeal.

> 12.    The applicant did not present, and have ruled upon, a motion to suppress evidence regarding the seizure of the murder weapon in this case.

> 13.    The issue regarding the seizure of the murder weapon in this case was addressed during the applicant's guilty plea and the applicant indicated that he was waiving any issue regarding the seizure of a weapon in South Carolina.

(Dkt. #16-2, pp. 333-34). The state habeas court then issued the following conclusions of law:

> 10.    A plea of guilty waives all non-jurisdictional defenses. [*Ex parte Williams*, 703 S.W.2d 674, 682 (Tex. Crim. App. 1986)].

> 11.    In fact, "[a] plea of guilty, if voluntarily and understandingly made, is conclusive as to the defendant's guilt and waives all non[-]jurisdictional defects including claimed deprivation of federal constitutional due process." *Hoskins v. State*, 425 S.W.2d 825 (Tex. Crim. App. 1967).

> 12.    If the non-jurisdictional error was waived, it cannot be the basis for habeas corpus relief. *See Ex parte McWilliams*, 634 S.W.2d 815 (Tex. Crim. App. 1980).

      13.    Since a plea of guilty, if voluntarily and understandingly made, is conclusive as to the defendant's guilt and waives all non[-]jurisdictional defects the non-jurisdictional claim regarding a seizure of a handgun was waived and cannot be the basis for habeas corpus relief.

(Dkt. #16-2, pp. 339-40). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court and on the court's independent review of the record (Dkt. #16-1), which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

      Petitioner fails to rebut the presumptive correctness of the state court's findings with clear and convincing evidence, nor does an independent review of the state court record reveal clear and convincing evidence that would rebut the presumption of correctness. Petitioner also fails to demonstrate that the state court's determination that Petitioner had waived his Fourth Amendment argument was an unreasonable application of, or contrary to, clearly established federal law. Fourth Amendment claims are waived when a petitioner voluntarily pleads guilty. *Norman v. McCotter*, 765 F.2d 504, 511 (5th Cir. 1985). Petitioner pled guilty; thus, he waived his right to challenge an unlawful stop or detention, an unlawful search and seizure, and other non-jurisdictional defects. *See id.*

      Moreover, even if his Fourth Amendment claims were not foreclosed by his guilty plea, they are foreclosed by the Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465, 494 (1976). In *Stone*, the Supreme Court held that federal courts have no authority to review a state court's application of Fourth Amendment principles in habeas corpus proceedings unless the petitioner was denied a full and fair opportunity to litigate his claims in state court. *Id.*; *see also Bell v. Lynaugh*, 828 F.2d 1085, 1091-92 (5th Cir. 1987), *cert. denied*, 484 U.S. 933 (1987) ("We need not spend much time addressing appellant's Fourth Amendment concerns, for appellant does not allege, nor does our independent review of the record indicate, that appellant did not have a full

and fair opportunity to litigate his Fourth Amendment claim in state court."). The opportunity, regardless of whether it is acted upon at the state level, is all that is required to preclude federal habeas review. *Smith v. Maggio*, 664 F.2d 109, 111 (5th Cir. 1981). Crucially, even errors in adjudicating Fourth Amendment claims are not an exception to *Stone*'s bar. *See Moreno v. Dretke*, 450 F.3d 158, 167 (5th Cir. 2006).

Here, Petitioner had an opportunity to obtain full and fair litigation of his Fourth Amendment claims in state court prior to pleading guilty. Indeed, the issue was raised during the plea hearing, but Petitioner chose not to pursue it and elected, instead, to enter a guilty plea.[9] (Dkt. #16-2, p. 324). Because Petitioner was not foreclosed from litigating his Fourth Amendment claim in state court, the Court may not review it in this federal habeas proceeding.

## C.   Claim Two and Claim Three

In Claim Two, Petitioner contends the trial court denied Petitioner due process when it knowingly accepted Petitioner's guilty plea despite Petitioner's history of mental illness. (Dkt. #3, p. 6). In Claim Three, Petitioner argues that the trial court abused its discretion when it refused to remove Petitioner's defense team. (Dkt. #3, p. 6). The Director asserts that Petitioner did not exhaust these claims and that they are procedurally barred. (Dkt. #15, pp. 7-11).

---

[9] Specifically, the following colloquy occurred between the trial court and Petitioner before Petitioner entered his guilty plea:

> [Trial Court].  I know that I think at some point in time, again, I can't remember if it's a letter or a conversation that I may have heard where you talked about trying to suppress the seizure of the weapon in South Carolina by these officers. You understand that by pleading guilty here today, that if there was an issue on that, that that is being—you are waiving that or giving that up?

> [Petitioner].  Yes.

> [Trial Court].  And, again, you are willing to do that and you believe that is in your best interest?

> [Petitioner].  Yes.

(Dkt. #16-2, p. 324).

16

### 1. Exhaustion and Procedural Default

A review of Petitioner's state court proceedings reveals that the Director is correct that Petitioner did not fairly and properly present these claims to the highest state court. Petitioner failed to raise these claims in his state habeas application. Therefore, the TCCA has not had an opportunity to review Petitioner's claims. Accordingly, Petitioner's Claim Two and Claim Three are unexhausted.

If a petitioner has failed to exhaust state court remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, the claims are procedurally defaulted for purposes of federal habeas review. *Coleman*, 501 U.S. at 735, n.1; *see also Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997). If Petitioner presented Claim Two and Claim Three at this time to the TCCA in another state writ application, the court would find the claims to be procedurally barred under the Texas abuse of the writ doctrine. Tex. Code Crim. Proc. Ann. art. 11.07 § 4; *Ex parte Whiteside*, 12 S.W.3d 819, 821 (Tex. Crim. App. 2000). Thus, upon return to federal court, the claims would be barred from federal habeas review under the federal procedural default doctrine. *See Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995) (the Texas abuse of the writ doctrine is an "independent and adequate" state procedural bar for purposes of federal habeas review); *see also Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008) ("Texas's abuse of the writ doctrine is a valid state procedural bar foreclosing federal habeas review.") (quoting *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007))). Petitioner fails to demonstrate cause for the default and actual prejudice or demonstrate that the failure to consider the claims would result in a fundamental miscarriage of justice; thus, Claim Two and Claim Three should be dismissed as procedurally barred. Alternatively, the Court finds that the claims are without merit.

2. **Claim Two**

Plaintiff's assertion in Claim Two—that the trial court denied Petitioner due process when it knowingly accepted Petitioner's guilty plea despite Petitioner's history of mental illness (Dkt. #3, p. 6)—is refuted by the state court record. As previously discussed, the record establishes that Petitioner knowingly and voluntarily pled guilty. Specifically, and as set forth above, Petitioner affirmed in the plea documents and at the plea hearing that he was mentally competent and understood the charge to which he was pleading guilty. At the plea hearing, the trial court specifically addressed the issue of Petitioner's mental competency:

> THE COURT:  Have you ever had your mental competency questioned in any way?
>
> MR. HENDRICKSON:  Your Honor, as a young man, he was—he did have some evaluations done. But, as an adult, he has not had any questions as to his competency, and is competent to enter his plea today.
>
> THE COURT: All right. Mr. Campbell, do you have any mental health issues?
>
> THE DEFENDANT: No, sir.

(Dkt. #16-2, p. 263). The prosecutor likewise questioned Petitioner about his mental competency:

> [Prosecutor]. Okay. So, I take it from your life experience and what you have indicated to me that you don't believe that you are mentally impaired in some way, mentally challenged, or mentally retarded; is that correct?
>
> [Petitioner]. It is.

(Dkt. #16-2, p. 269). Additionally, the prosecutor discussed with Petitioner his history of mental illness:

> [Prosecutor]. Okay. I want to talk a little bit about your background, also.
>
> As your lawyer indicated, back in your teen years, I know that your mom made several referrals to mental health hospitals about you, correct?
>
> [Petitioner]. Correct.

18

[Prosecutor]. And what I'm going to be talking about is I'm not necessarily asking you to agree with me, but what I'm basically going to be talking to you about is what the records reflect. Okay?

[Petitioner]. Okay.

[Prosecutor]. The records reflect that your mom, I think, from the time you were about 13 to 16, or 17, took you in several times, and were you, in fact, hospitalized?

[Petitioner]. I was.

[Prosecutor]. My understanding from the records is that a lot of that was believed to be a substance-induced mood disorder from the use of marijuana and maybe cocaine?

[Petitioner]. Yes, sir.

[Prosecutor]. And so, were you using those drugs back then?

[Petitioner]. I was.

[Prosecutor]. Okay. Your mom indicated that you would get very angry and fly into a ra[]ge. In fact, at one time, when you were 13, [you] tried to burn the house down.

So, I guess my question would be, when do you feel like that that type of situation going on inside of you ended?

[Petitioner]. First off, I was never actually aggressive, but I have had problems with getting into strong arguments with my mother. And burning the house down, I was young and dis-experienced, and having a lighter in my hand, you know, I accidentally set a bag on fire. That's how it started. I didn't purposefully try to burn our house down.

[Prosecutor]. Okay. Well, you understand that, again, going on the records that we have acquired from, the various hospitals, that's the history that your mother gave? Do you understand that?

[Petitioner]. Uh-huh.

[Prosecutor]. Okay. And so, do you feel like — I know there were times when you were hospitalized that you indicated that you had heard voices, things like that. I guess what I'm trying to find out is, has that stopped?

[Petitioner]. It has.

[Prosecutor]. Okay. And, as best as you can, could you indicate to me when you feel like that hearing the voices and this problem that you were having back when your mom referred you to this mental hospital, when that stopped?

[Petitioner]. Around that time.

[Prosecutor]. Around that time?

[Petitioner]. Yes, sir.

[Prosecutor]. So, during your basic adult years, do you feel like that you have been mentally sound?

[Petitioner]. I don't understand what you mean.

[Prosecutor]. Okay. What I mean by that is, do you feel like that you have heard voices as an adult?

[Petitioner]. No.

[Prosecutor]. Do you feel like that you've been paranoid? Do you understand what I mean by "paranoid"?

[Petitioner]. I have been paranoid.

[Prosecutor]. Okay. And how has that shown itself, do you think, in your life?

[Petitioner]. I don't understand.

[Prosecutor]. Okay. I mean, have you thought people were just out to get you, generally?

[Petitioner]. Sometimes.

[Prosecutor]. All right. And so, have you been on any medication for that as an adult?

[Petitioner]. Yes, sir.

[Prosecutor]. And when was the last time you took any of that?

[Petitioner]. Since being here in this jail—

[Prosecutor]. Okay. And so, do you feel like that you need to be on any medication to know what is going on?

20

[Petitioner]. Not necessarily to know what is going on, no,

[Prosecutor]. Okay, So, I guess, my question is, since you are not on those medications and we're sitting here in court, we all want to be sure that your mental state is such that you understand exactly what you are doing. And so, do you believe that you do?

[Petitioner]. Yeah, I do.

(Dkt. #16-2, pp. 275-78). The trial court found that Petitioner was mentally competent to enter the plea. (Dkt. #16-2, p. 265).

The Court finds that the state court proceedings refute Petitioner's assertion that he was denied due process when the trial court accepted his guilty plea despite his history of mental illness. The record demonstrates that, although Petitioner had suffered from mental illness when he was younger, at the time he entered his guilty plea, the record shows that he was not suffering from any mental impairment that rendered him mentally incompetent and unable to understand the nature of the plea proceedings. Indeed, Petitioner continually affirmed that he was mentally competent and understood the nature of the plea proceedings. Mental illness does not necessarily equate to incompetency, and the record here clearly shows that Petitioner was competent to enter a guilty plea and that he was not denied due process by the trial court's acceptance of the guilty plea. *See Bolius v. Wainwright*, 597 F.2d 986, 990 (5th Cir. 1979) (holding that the mere presence of some mental illness or other mental disability at the time a petitioner entered guilty pleas in state court does not necessarily mean that the petitioner was incompetent to plead; the mental illness or disability must have been so debilitating that the petitioner was unable to consult with his counsel and did not have a rational and factual understanding of the proceedings). Thus, even assuming Claim Two is not procedurally barred, Petitioner is not entitled to habeas relief on this ground, and the claim should be denied.

### 3.  Claim Three

In Claim Three, Petitioner argues the trial court abused its discretion when it refused to remove Petitioner's defense team, Mark Hendrickson and Susan E. Anderson. (Dkt. #3, p. 6). Although unclear on what basis Petitioner believes his counsel should have been removed, Petitioner argues that he had "planned on going to trial" but that his counsel "refused to work for [him]." (Dkt. #3, p. 6).

To the extent Petitioner alleges that his counsel should have been removed because they threatened or coerced him into pleading guilty and refused to take his case to trial, this claim is refuted by the record. As discussed at length above, the record clearly establishes that Petitioner affirmed his desire to plead guilty, that he was satisfied with his counsel's representation, and that he voluntarily and knowingly pled guilty. At no time during the plea hearing did Petitioner indicate to the trial court that he wanted to proceed to trial or that trial counsel refused to do so upon Petitioner's request. Trial counsel also refuted any allegation that they threatened or coerced Petitioner into pleading guilty. In her affidavit submitted to the state habeas court, Ms. Anderson states:

> At no time did I, or any person associated with the case, attempt to coerce Mr. Campbell into entering a plea in this case. The State placed a plea deadline on his case of February 8, 2019. If Mr. Campbell had not accepted the Offer of Life Without Parole (LWOP) by that date, the DA said he would withdraw the offer and the case would continue to trial. On January 29-31, 2018, I traveled to Grayson County Jail and spent the entire day with Mr. Campbell reviewing all of the evidence we anticipated the State would bring to the jury if the case went to trial.

> On February 1, 2019 our team, consisting of Investigator Mike Johnson, Mitigation Specialist Patricia Rist, and myself went to the Grayson County Jail to show Mr. Campbell a presentation of both the Guilt-Innocence and Sentencing phase evidence. During our presentation, we did not give our opinions as to how a judge or jury might view the case, merely what we anticipated would be presented to them from both the Prosecution and Defense. At the end of the presentation, we did not talk about the plea offer or ask him his intentions regarding accepting or rejecting said offer.

On February 2, 2019, Wilbert Rideau, a consultant hired by our team came to visit with Mr. Campbell. Mr. Rideau was there to speak to Reggie about life in prison and what can still be achieved. He told Reggie that if the jury sentences him to death, he will spend the rest of his life trying to save his life, but if he accepts LWOP, he will spend the rest of his life trying to get it commuted to Life. Mr. Rideau spent several hours with him on February 3, 2019, and when they were finished, Mr. Rideau informed me that Mr. Campbell wanted to accept the offer of the State.

On February 4, 2019, Ms. Rist and I went to Grayson County Jail to visit with Mr. Campbell to see how he was doing. When we arrived, he handed Ms. Rist a pile of legal papers he wanted her to send to his grandmother because he intended to take a plea on Friday. We asked him if that is what he really wanted to do, and he said it was. I went over what rights he would be giving up and a general overview of the paperwork involved. I prepared him for the fact that the DA would want to ask him questions about the offense and that Mark and I would do what we could to make it go as smoothly as possible.

On Friday, February 8, 2019, the entire team met with Mr. Campbell at the jail to discuss the plea and was later with him in court to enter his to enter his plea. When we arrived at the jail, we asked him if he was still sure about his decision and he said that he was. We met him in court after lunch and went over all of the plea paperwork with him. We then went into court to put the plea on the record. The judge went over the plea paperwork with Mr. Campbell and enquired as to whether he was entering the plea freely and voluntarily or if he felt he was coerced into accepting the plea. Mr. Campbell told the court he was doing it of his own free will and that no one threatened him or coerced him in any way to enter into the agreement. The DA asked Mr. Campbell about his participation in the offense and Mr. Campbell detailed how he and his codefendants committed the offense and his attempts to evade law enforcement afterwards. At the close of testimony, the judge accepted the plea and sentenced Mr. Campbell to Life Without Parole.

At no time during our representation of Mr. Campbell, did I, or anyone in my presence, ever state to Mr. Campbell that the jury would give him the Death Penalty. Throughout the course of our representation, I went over the entire range of punishment with Mr. Campbell which, in this case, is Life Without Parole (LWOP) or the Death Penalty. I told him that while we could not guarantee any outcome, the statistics in Texas show that far more juries return a "death" verdict than LWOP. He was certain that because he had never been in "real" trouble before, the jury would not do that. I explained that his lack of prior criminal history is part of the picture we would present to a jury when asking for LWOP. Our team told Mr. Campbell on numerous occasions that the State will want to focus on one cell in the motion picture of his life and it was our job to bring the jury the rest of the movie from the time he was born until the date of verdict and the way we do it is through an extensive mitigation investigation. We would investigate every avenue

possible to dig up evidence to present to the jury for their consideration when deciding whether to grant life or death.

During our investigation, we amassed a list of close to 250 names including family members, teachers, employers, jailers, friends, and other people who may have knowledge of Mr. Campbell and his history, such as doctors, counselors, and/or therapists. Of the persons on his list of 75 names (many of which were already on our radar), we were able to locate and interview (or attempt to interview) 52 of them. Our investigation took investigators and mitigation specialists to the states of Oklahoma, Nevada, North Carolina, South Carolina, Georgia, and New York. During our discussions with Mr. Campbell about any sentencing phase of his trial, [we] told him that the quality of the witness will always win out over the quantity of witnesses and as the time drew nearer to trial, we will have a hard look at what witnesses will be called and for what purpose. I told him that in my experience, in criminal trials, juries look to see who is in the courtroom supporting a defendant and if they look out and see no one sitting behind him, it gives the illusion that his family and friends do not support him. I explained that sometimes less is more and if we put the witnesses with the greatest impact on the stand and allow the remaining witnesses to stay in the courtroom for support, we get the benefit of the direct testimony as well as the psychological impact on the jury of supporters in the courtroom.

(Dkt. #16-2, pp. 247-49). Mr. Hendrickson's affidavit similarly provides:

Mr. Campbell was never threatened or coerced by Defense Counsel. At all times, Defense Counsel informed Mr. Campbell of the charges against him, his options, and provided advice pertaining to likely outcomes depending on the options before him. Early on, State offered Mr. Campbell the option to plead to life without the possibility of parole. This option was taken to Mr. Campbell. Upon inquiry from Mr. Campbell, Defense Counsel and its team provided our assessment as to the likely outcomes based on the options before Mr. Campbell. It was our assessment that should Mr. Campbell proceed to trial, he would likely be found guilty of Capital Murder based on our review of the evidence and the potential testimony of two alleged codefendants. We informed Mr. Campbell that with such a finding, the sentencing range would be life without the possibility of parole or the penalty of death. After consultation with Counsel, the entirety of the Defense team, and experts, over several months, Mr. Campbell informed Counsel Susan Anderson and mitigation expert Patricia Rist of his desire to enter his plea. This was based, in part, on the position taken by State that it would not hold the option to plea to life without the possibility of Parole for much longer.

At no time did Counsel, the defense team, or any of the defense team experts threaten or coerce Mr. Campbell to enter his plea of guilty. . . .

(Dkt. #16-2, p. 242, ¶ 3).

The state habeas court found that counsel's affidavits were credible (Dkt. #16-2, p. 334, ¶ 14) and that "[a]t no time did either attorney or any person associated with the case, coerce or attempt to coerce the applicant into entering a plea in this case." (Dkt. #16-2, p. 334, ¶ 21). The TCCA then adopted the state habeas court's findings when it denied relief without written order.

Petitioner fails to rebut the presumptive correctness of the state court's findings with clear and convincing evidence, nor does an independent review of the state court record reveal clear and convincing evidence that would rebut the presumption of correctness. The record establishes that Petitioner's trial counsel thoroughly investigated the case and that they were prepared to go to trial if Petitioner so desired. The record further shows that Petitioner decided to plead guilty and that he did so without coercion from his counsel or any other individual. Thus, Petitioner fails to demonstrate that trial counsel should have been removed because they refused to take Petitioner's case to trial and instead coerced Petitioner into pleading guilty.

To the extent Petitioner alleges that his counsel should have been removed based on a conflict of interest, Petitioner does not clearly identify the conflict of interest. Furthermore, the record does not show that trial counsel labored under any conflict of interest. Trial counsel addressed Petitioner's conflict of interest claim raised in his state habeas application. Mr. Hendrickson's affidavit provides as follows:

> Trial Counsel had no conflict of interest in Mr. Campbell's case. At no time did Trial Counsel's representation violate Strickland v. Washington, the Sixth Amendment of the United States, Wood v. Georgia, or any other case law cited by Mr. Campbell.

> Mr. Campbell complains that a conflict arose when Counsel failed to review the entire "contract or plea agreement" with Mr. Campbell.

> In fact, Mr. Campbell reviewed the entire plea agreement, admonition, and all other paperwork related to his case with counsel and mitigator present. The entirety of the documents were presented to Mr. Campbell and reviewed in the presence of several witnesses. Prior to, during, and after this process, Defense Counsel and the

Defense team repeatedly asked Mr. Campbell if it was his intent and desire to enter this plea and Mr. Campbell repeatedly responded in the affirmative.

During the entry of this plea agreement, Mr. Campbell made several statements under oath to this Court. Mr. Campbell did so after admonition by this Court of his right to remain silent and on page six of the plea transcript Mr. Campbell waived this right as it pertains to this plea. This Court then informed Mr. Campbell that this entry of a plea would waive his right to a trial in this case and what that means to Mr. Campbell. On page seven of the plea transcript, Mr. Campbell voluntarily and intentionally waived his right to trial. This Court then admonished Mr. Campbell that in entering his plea he would waive his right to confront any witnesses against him or call witnesses on his behalf and that is because he is "admitting the allegations" himself. On page seven of the plea transcript, Mr. Campbell agreed to waive his right to call and confront witnesses. This Court further admonished Mr. Campbell that in entering this plea he must waive his right against self-incrimination. The Court explained that this means he would be pleading guilty to the charge. On page eight of the plea transcript Mr. Campbell voluntarily and intentionally waived his right against self-incrimination. This Court then admonished Mr. Campbell, "if you plead guilty on this, I'm going to find you guilty, and the end result of that is you are going to have life in prison without parole". Mr. Campbell agreed that he understood this statement on page eight of the plea transcript.

On page eleven of the plea transcript, this Court stated on the record that it had received all of the documents related to the plea of guilty. This Court inquired as to if Mr. Campbell had signed these documents and if they bore his signature. Mr. Campbell acknowledged that his signature appeared on these documents. This Court then asked Mr. Campbell, "did you sign these freely and voluntarily?" to which Mr. Campbell responded, "I did". This Court further asked Mr. Campbell, "did you sign these only after you had a chance to go over them with your attorneys so that you really understood what it is you were signing?" to which Mr. Campbell replied, "Yes. Sir". This Court further asked Mr. Campbell, "Do you understand that by signing these, you are waiving certain constitutional rights and you're making certain factual admissions in your case?" to which Mr. Campbell responded, "Yes, sir". Upon inquiry by this Court, Mr. Campbell admitted he had no questions about the paperwork he had provided this Court.

After the Court asked these questions, Assistant District Attorney Ashmore further inquired of Mr. Campbell about his plea, it's voluntariness, and his understanding of the plea. Mr. Campbell did not back away from his plea or show that he did not understand what he was doing.

Mr. Campbell was provided the "contract or plea agreement" prior to appearing in court, it was reviewed in its entirety and signed in the presence of Counsel and witnesses. Mr. Campbell further admitted under oath that he had read the entirety

of the paperwork, that he understood the documents, signed them, did so freely and voluntarily, and had no questions pertaining to the paperwork.

While I am not entirely sure what Mr. Campbell is calling a conflict of interest in this case, this answer details my response to his complaint in his writ pertaining to such alleged conflict.

(Dkt. #16-2, pp. 241-42, ¶ 2). Ms. Anderson's affidavit further provides:

In my opinion, a conflict of interest did not exist in this case. Waivers of appeal have been consistently upheld on appeal as enforceable if there has been consideration given in exchange for the waiver. The case cited by Mr. Campbell in the writ application refers to waivers of Ineffective Assistance of Counsel, which are not enforceable. However, in this case, the only waiver filed was a waiver of appeal of any issues not previously raised by written motion and subsequently ruled upon. In my opinion, a waiver is enforceable if there was consideration given for such a waiver. In this case, the State of Texas agreed to not seek the death penalty and offer Mr. Campbell Life Without Parole in exchange for a plea bargain and a waiver of appeal. I do not believe this created a conflict of interest.

(Dkt. #16-2, p. 247, ¶ 2).

The state habeas court found that counsel's affidavits were credible (Dkt. #16-2, p. 334, ¶ 14) and noted that both attorneys stated there was no conflict of interest (Dkt. #16-2, p. 334, ¶ 16). Thus, the state court implicitly found that trial counsel did not labor under any conflict of interest. The TCCA then adopted the state habeas court's findings when it denied relief without written order. Petitioner fails to rebut the presumptive correctness of the state court's findings with clear and convincing evidence, nor does an independent review of the state court record reveal clear and convincing evidence that would rebut the presumption of correctness. Unsupported conclusory allegations do not warrant habeas relief. *Uresti v. Lynaugh*, 821 F.2d 1099, 1103 (5th Cir. 1987). Simply put, the record does not demonstrate that trial counsel labored under any conflict of interest warranting removal.

Thus, even assuming Claim Three is not procedurally barred, Petitioner is not entitled to habeas relief on this ground, and the claim should be denied.

D.    **Claim Four**

Plaintiff asserts several instances of ineffective assistance of counsel. A voluntary guilty plea waives all non-jurisdictional defects including claims of ineffective assistance of counsel, except insofar as the ineffectiveness is alleged to have rendered the guilty plea involuntary. *United States v. Glinsey*, 209 F.3d 386, 392 (5th Cir. 2000); *Smith v. Estelle*, 711 F.2d 677, 682 (5th Cir. 1983); *Barrientos v. United States*, 668 F.2d 838, 842 (5th Cir. 1982); *see also Tollett v. Henderson*, 411 U.S. 258, 267 (1973) (a knowing and voluntary guilty plea waives all non-jurisdictional deprivations that occurred prior to the plea). To show that counsel's representation resulted in an involuntary plea, a petitioner must show that his counsel's representation fell below an objective standard of reasonableness and that petitioner was prejudiced as a result of counsel's deficiencies. *Hill v. Lockhart*, 474 U.S. 52, 51 (1985) (noting that *Strickland v. Washington*, 466 U.S. 668 (1984), applies to cases involving guilty pleas).

Under the first *Strickland* prong, a petitioner must establish his counsel's performance fell below an objective standard of reasonable competence. *Strickland*, 466 U.S. at 688; *see also Yarborough v. Gentry*, 540 U.S. 1, 3 (2003). But when deciding whether counsel's performance was deficient, a federal habeas court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 at 688-89. Hence, a federal habeas court presumes that counsel's choice of trial strategy is objectively reasonable unless clearly proven otherwise. *Id.* at 689. Indeed, counsel's strategic choices, made after a thorough investigation of the law and facts relevant to plausible options, are virtually unchallengeable. *Id.* at 673; *Pape v. Thaler*, 645 F.3d 281, 289-90 (5th Cir. 2011).

Under the second *Strickland* prong, a petitioner must demonstrate his counsel's deficient performance prejudiced him. *Strickland*, 466 U.S. at 687; *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003). In the context of a guilty plea, proving *Strickland*'s prejudice requirement turns "on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, 474 U.S at 59. This means, "in a guilty plea scenario, a petitioner must prove not only that his attorney actually erred, but also that he would not have pled guilty but for the error" and, instead, "would have insisted upon going to trial." *Armstead v. Scott*, 37 F.3d 202, 206 (1994) (citations omitted); *see also Hill*, 474 U.S. at 59. This assessment will turn partially on "a prediction of what the outcome of a trial might have been." *Armstead*, 37 F.3d at 206.

In addition to applying the *Strickland* two-prong test, a federal habeas court must review a state petitioner's ineffective assistance of counsel claim "through the deferential lens of [28 U.S.C.] § 2254(d)." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). It must consider not only whether the state court's determination was incorrect, but also "whether that determination was unreasonable—a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Thus, in light of the deference accorded by § 2254(d), "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101.

Furthermore, a petitioner's allegations of ineffective assistance of counsel must be supported by the record. *United States v. Johnson*, 679 F.2d 54, 58-59 (5th Cir. 1982). Even when liberally construing pro se pleadings, "mere conclusory allegations on a critical issue . . . are insufficient to raise a constitutional issue." *Black v. Davis*, 902 F.3d 541, 547 (5th Cir. 2018) (citation omitted). More specifically, conclusory statements are insufficient to sustain a claim of ineffectiveness. *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001).

With the foregoing principles in mind, the Court will turn to Petitioner's specific allegations of ineffective assistance.

Petitioner claims that he was denied effective assistance of counsel when counsel failed to: (a) file a motion to suppress evidence regarding seizure of the murder weapon; (b) file a motion to change venue; and (c) request the trial court for funding to hire a psychiatrist due to Petitioner's history of mental illness. These claims were fully developed during the state habeas corpus proceedings. Petitioner's trial counsel submitted individual affidavits addressing each alleged instance of ineffective assistance of counsel. (Dkt. #16-2, pp. 240-52).

### 1.  Trial Counsel's Affidavits

#### a.  *Failure to File a Motion to Suppress Evidence*

Petitioner first claims that counsel rendered ineffective assistance by failing to file a motion to suppress evidence regarding seizure of the murder weapon. (Dkt. #3, p. 7). In responding to this claim on collateral review, Mr. Hendrickson testified in his affidavit as follows:

> Counsel chose not to file a motion to suppress related to the firearm in this case. The evidence provided to Counsel showed that the firearm tested was obtained as a result of a lawful attempted arrest in South Carolina. During this attempted arrest, according to the police report of Investigator McClaran, Mr. Campbell resisted arrest. Mr. Campbell gave officers a false name during this attempted arrest. Mr. Campbell fought with officers who attempted to arrest him. During the struggle to arrest Mr. Campbell, an officer found Mr. Campbell to be in possession of a gun and such gun was in his right front pants pocket. Mr. Campbell allowed the officer to take the gun from his pocket. The officer then threw the gun away from the location of the struggle to arrest Mr. Campbell. At some point during the struggle, Mr. Campbell was able to get away from the officers and flee. Mr. Campbell fled the officers and in so doing abandoned the gun. The gun was taken into custody at the time. On page 55 of the plea transcript Assistant District Attorney Ashmore asks Mr. Campbell "and they were able to seize this 380 handgun from you, right?" to which Mr. Campbell states, "Yes".
>
> The evidence, based on independent investigation and the reports of officers present, shows that the gun was located on Mr. Campbell and not in a backpack as stated by Mr. Campbell. It is true that in the plea Mr. Campbell denies that the gun was on his person but that it was in the car where he fought with officers attempting

to arrest him. He says it was in a backpack that was in the car. According to the police report, the backpack was left outside of the vehicle on the ground. When Mr. Campbell fled, he abandoned the backpack and the gun.

Ballistics testing was performed on the gun taken in South Carolina and showed the gun to be the same gun used in the Capital Murder for which Mr. Campbell was charged. Counsel obtained a ballistics expert. Counsel requests this Court take judicial notice of Defendant's funding motion "F". After consultation with our expert, and with no contrary evidence to the offense report of Investigator McClaran, Counsel chose to delay any decision related to suppression of the firearm pending the finding of any new, undiscovered evidence.

It is worth noting that under questioning from Assistant District Attorney Ashmore during the plea in Mr. Campbell's case, Mr. Ashmore inquired of Mr. Campbell if this gun taken from him in South Carolina was the gun used in the instant offense to which Mr. Campbell stated, "Yes".

(Dkt. #16-2, pp. 244-45, ¶ 8). Ms. Anderson's affidavit further explains:

In August 2017, ATF agent Brian McClaran and Sgt. Cox were in South Carolina with a federal arrest warrant, signed by Magistrate Kimberly Priest-Johnson on August 18, 2017. The existence of the warrant was verified by undersigned counsel through access to the federal court records through the PACER system as well as speaking with the AUSA assigned to the case. We also received a copy of the warrant through the discovery process.

According to police accounts, on August 23, 2017, the officers were conducting surveillance on Mr. Campbell and saw him and his sister leave his sister's apartment. When they left, the officers followed them to his niece's daycare facility and on the way, called the Columbia Police Department for backup. Mr. Campbell's sister went inside the daycare and the officers approached the car to serve the warrant. While they were serving the warrant, a struggle ensued inside of the car, and the gun was recovered during this struggle. Mr. Campbell was able to break away from the officers and fled into the woods. He was ultimately captured in the State of New York and extradited back to Texas.

In Mr. Campbell's application, he claims the weapon recovered was taken from the backpack without a warrant and that is the basis for his claim. Through the course of our investigation, we interviewed Mr. Campbell several times about this incident. In an interview on April 24, 2018, Mr. Campbell told us that when the officers attempted to arrest him, they engaged in a struggle and during this struggle, one of the officers felt a gun on Mr. Campbell's person. When asked if it was a gun, Mr. Campbell told the officer it was, and then told him to take it. Ballistics later connected the gun retrieved from Mr. Campbell to the weapon used in the capital murder of Brandon Hubert.

> Due to the fact that there was a valid active arrest warrant, the recovery of the weapon occurred during the serving of the arrest warrant, and that there was no fact in issue surrounding the struggle and recovery of the weapon, we did not feel it was appropriate to file a Motion to Suppress.

(Dkt. #16-2, p. 251, ¶ 8).

### b. Failure to File a Motion to Change Venue

Petitioner next claims that trial counsel was ineffective for failing to file a motion to change venue. (Dkt. #3, p. 7). In responding to this claim on collateral review, Mr. Hendrickson testified in his affidavit as follows:

> Counsel did not ignore the requests of Mr. Campbell to file motions in this case. . . .
>
> c.  Motion to Change Venue: Mr. Campbell raised this request more than once. Counsel advised Mr. Campbell that in its opinion, this issue was not ripe before the Court. We have no evidence that Grayson County could not obtain an unbiased jury due to publicity or other reasons. We advised Mr. Campbell that we would revisit this closer to trial and would file such motion if our examination warranted.

(Dkt. #16-2, p. 243, ¶ 7).

Ms. Anderson similarly testified in her affidavit as follows:

> In my opinion, the filing of motions is soundly within the discretion of counsel. Each time Mr. Campbell brought up the issue of motions, we discussed them and why we felt the motion was either valid, frivolous, inapplicable, or not ripe. Attached is a copy of my written response sent to Mr. Campbell regarding these motions. See Exhibit 7A-148 SA Letter to Client 2018.09.11

(Dkt. #16-2, pp. 250-51, ¶ 7).  In Ms. Anderson's letter to Petitioner about the motion to change venue, she explained to Petitioner that the motion was "premature, since the case is not set for trial" but that counsel would be "looking into the media and publicity on the case and developing any evidence and witnesses in preparation for this motion, should it be needed." (Dkt. #16-2, p. 254).

> ### c. *Failure to Request Funding for a Psychiatrist*

Petitioner further asserts that trial counsel rendered ineffective assistance by failing to request the trial court for funding to hire a psychiatrist due to Petitioner's history of mental illness. (Dkt. #3, p. 7).

In responding to this claim on collateral review, Mr. Hendrickson testified in his affidavit as follows:

> Counsel did not request to examine Mr. Campbell for competency, as is evident from the record. Counsel would request this Court take judicial notice of the fact that at no time did Counsel approach this Court for funds for an expert related to competency in Mr. Campbell's case. Counsel would further request this Court take judicial notice of the funding request labeled "K" for a neuropsychological expert.
>
> Counsel, in fact, did obtain expert assistance in the evaluation of Mr. Campbell and in so doing obtained an expert opinion that Mr. Campbell was presently competent and able to understand the consequences of his decisions as they relate to a plea in this case. Therefore, counsel did not pursue the question of competency in Mr. Campbell's case nor an expert specific to this question.

(Dkt. #16-2, p. 242, ¶ 4). Ms. Anderson's affidavit similarly provides:

> Reginald Campbell was seen by one or more members of the defense team approximately every two weeks from the time of our appointment until the date he entered his plea. He was also seen by a neuropsychologist, a medical doctor, a neuroscientist, and a prison specialist. None of the experts who visited indicated they had any concern as to his competence to stand trial.
>
> At no time during any of the meetings with counsel and mitigation specialists did Mr. Campbell exhibit a lack of rational or factual understanding of the proceedings against him. He asked relevant questions with regards to pretrial and trial procedures, and relevant follow-up questions indicating an understanding of our initial response. Mr. Campbell was also able to assist his trial team in preparing for the defense of his case in that he was able to speak rationally about the facts of the case, he exhibited an understanding of the defenses, and was able to give us names and locations of potential witnesses.
>
> The question of a defendant's competency to stand trial is always considered when preparing cases for trial. In the case of Mr. Campbell, the issue of competence was considered, and subsequently rejected because we did not feel a competence claim would have any merit.

(Dkt. #16-2, pp. 249-50, ¶ 4).

### 2.  State Court's Findings and Conclusions

The state habeas court found that counsel's affidavits were credible (Dkt. #16-2, p. 334, ¶ 14) and that when Petitioner requested the filing of certain motions, "trial counsel would discuss those motions and why counsel felt the motions was either valid, frivolous, inapplicable, or not ripe" (Dkt. #16-2, p. 337, ¶ 41). The state court also found that when questioned by the trial court, Petitioner "made no complaints about his attorneys or raised any issue regarding the failure of counsel to file requested motions." (Dkt. #16-2, p. 337, ¶ 42). With respect to Petitioner's claim that based on his prior mental issues, trial counsel was ineffective for failing to hire an expert regarding his competency, the state habeas court found as follows:

26.    [T]he applicant spent many hours with his defense team.

27.    At no time during the meetings with counsel and mitigation specialists did the appellant exhibit a lack of rational or factual understanding of the proceedings against him.

28.    The applicant was competent and able to understand the consequences of his decisions as they related to a plea in this case.

29.    The trial court's questioning of the applicant also concluded that despite any mental issues as a juvenile, the applicant was competent and understood the nature of the proceedings against him and the consequences of a guilty plea.

(Dkt. 16-2, pp. 335-36).

The state habeas court then made the following conclusions of law with respect to Petitioner's ineffective assistance of counsel claims:

14.    On a claim of ineffective assistance of counsel, an applicant must show (1) omissions or other mistakes which amount to professional errors and (2) that there is a reasonable possibility that the outcome of the trial would be different but for the errors. *Strickland*, 466 U.S. 668.

15.     The Court of Criminal Appeals of Texas [has] found that the Texas Constitution requires the same showing. *Hernandez v. State*, 726 S.W.2d 53 (Tex. Crim. App. 1986).

16.     In determining whether ineffective assistance of counsel has been shown, the Court of Criminal Appeals will presume that trial counsel made all significant decisions in the exercise of reasonable professional judgement. *Delrio v. State*, 840 S.W.2d 443 (Tex. Crim. App. 1992).

17.     Claims of ineffective assistance of counsel are to be evaluated by the standards followed at the time of the trial and must be shown by Applicant by a preponderance of the evidence. *Ex parte Kunkfe*, 852 S.W.2d 499 (Tex. Crim. App. 1993).

18.     An essential requisite to successfully attacking a guilty plea on ineffective assistance grounds is that appellant must show the alleged deficiencies ca[u]sed his plea to be unknowing and involuntary. *Rodriguez v. State*, 899 S.W.2d 658 (Tex. Crim. App. 1995).

19.     The applicant has failed to prove by a preponderance of the evidence (1) omissions or other mistakes which amount to professional errors and (2) that there is a reasonable possibility that the outcome of the trial would be different but for the alleged errors.

20.     The applicant has also failed to prove by a preponderance of the evidence that the alleged deficiencies ca[u]sed his plea to be unknowing and involuntary.

(Dkt. #16-2, pp. 340-41). The TCCA subsequently denied relief without a written order based on the findings of the state habeas court and on the court's independent review of the record (Dkt. #16-1), which constitutes an adjudication on the merits. *See Singleton*, 178 F.3d at 384.

Petitioner fails to rebut the presumptive correctness of the state court's findings with clear and convincing evidence, nor does an independent review of the state court record reveal clear and convincing evidence that would rebut the presumption of correctness. Petitioner also has not shown, as required by 28 U.S.C. § 2254(d), that the state court's adjudication of Petitioner's ineffective assistance of counsel claims resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court,

or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. *See Moore*, 313 F.3d at 882. The state habeas court carefully and thoroughly discussed the facts and reasonably applied *Strickland* to the facts before it. It is clear in the Fifth Circuit that "counsel is not required to make futile motions or objections." *Roberts v. Thaler*, 681 F.3d 597, 611 (5th Cir. 2012) (quoting *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990)); *see also Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984). "Failure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994). Furthermore, a determination of ineffectiveness depends on whether a motion or an objection would have been granted or sustained had it been made. *United States v. Oakley*, 827 F.2d 1023, 1025 (5th Cir. 1987); *McLean v. Dir., TDCJ-CID*, No. 4:07CV298, 2010 WL 3702585, at *6 (E.D. Tex. Sept. 15, 2010).

Petitioner fails to overcome the strong presumption that trial counsel's decision not to file certain motions was strategic. As reflected by trial counsel's affidavit, they were aware of the relevant facts and law and reasonably determined that the motions would be either meritless or premature. Petitioner also fails to demonstrate that the motions he urges trial counsel should have filed would have been granted. And, even more importantly, Petitioner fails to demonstrate that trial counsel's alleged deficiencies resulted in an involuntary plea or that he would not have pled guilty but for trial counsel's errors and, instead, would have insisted upon going to trial. *See Hill*, 474 U.S. at 59; *Armstead*, 37 F.3d at 206. In sum, Petitioner fails to show that he was denied effective assistance of counsel in connection with his plea or that the state court's decision to deny relief was unreasonable or contrary to clearly established federal law in that regard. Accordingly, Petitioner has not shown that he is entitled to federal habeas corpus relief with respect to his ineffective assistance of counsel claims and they should be denied.

## V.  CONCLUSION

Petitioner fails to show that he is entitled to federal habeas relief. Specifically, Petitioner fails to show that his guilty plea was involuntary, unknowing, or coerced. Petitioner's Fourth Amendment claims (Claim One) were waived when he pled guilty and are foreclosed by *Stone v. Powell*. Petitioner failed to exhaust Claim Two and Claim Three and such claims are now procedurally barred from habeas corpus review; alternatively, Claim Two and Claim Three are without merit. Petitioner also fails to demonstrate that trial counsel rendered ineffective assistance under *Strickland* (Claim Four). Specifically, Petitioner fails to demonstrate that trial counsel's alleged deficiencies resulted in an involuntary plea or that he would not have pled guilty but for trial counsel's errors and, instead, would have insisted upon going to trial. Above all, Petitioner fails to show that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Williams*, 529 U.S. at 402-03, 405-06; *Childress v. Johnson*, 103 F.3d 1221, 1224-25 (5th Cir. 1997). In sum, Petitioner fails to show there was no reasonable basis for the state court to deny relief. *Richter*, 562 U.S. at 98. Accordingly, Petitioner's habeas petition should be denied and dismissed.

## VI.  CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the Court of Appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B). Although Petitioner has not yet filed a notice of appeal, it is recommended that the Court, nonetheless, address whether Petitioner would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (holding

that a district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court," noting that "[f]urther briefing and argument on the very issues the court has just ruled on would be repetitious").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a substantial showing of the denial of a constitutional right in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). When a district court denies a motion on procedural grounds without reaching the underlying constitutional claim, a certificate of appealability should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id.*

In this case, it is recommended that reasonable jurists could not debate the denial of Petitioner's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *See Miller-El v. Cockrell*, 537 U.S. 322, 336-37 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, it is recommended the Court find that Petitioner is not entitled to a certificate of appealability.

## VII. RECOMMENDATION

It is recommended that the above-styled petition filed under 28 U.S.C. § 2254 be denied and that the case be dismissed with prejudice. It is further recommended that a certificate of appealability be denied.

Within fourteen days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(c). To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*), *superceded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**So ORDERED and SIGNED this 9th day of May, 2023.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE